IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CHRIS CARR and CARR FOR GEORGIA, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> WBJ LEADERSHIP COMMITTEE, INC.; W. BURT JONES in his personal and official capacity as Lt. Governor of the State of Georgia; BURT JONES FOR GEORGIA, INC., <br><br> *Defendants*. | Civil Action No. _____ |

**BRIEF IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Three years ago, this Court set clear ground rules for leadership committees. It made clear that a leadership committee infringes on the First Amendment rights of other candidates when one candidate with a leadership committee is able to raise and spend funds with different contribution limits than other candidates in a primary or general election. *Perdue v. Kemp*, 584 F. Supp. 3d 1310, 1323 (N.D. Ga. 2022) (primary); *One Georgia, Inc. v. Carr*, 601 F. Supp. 3d 1291, 1309 (N.D. Ga. 2022) (general).

Despite knowledge of these decisions, Mr. Jones and his leadership committee, WBJ Leadership Committee, are raising and spending unlimited funds for the 2026 Republican primary election against Mr. Carr. And Mr. Jones has gone many steps further as well: he loaned his leadership committee $10 million in an apparent attempt to utilize the leadership committee to wash contribution limits off unlimited funds he can then place directly into his candidate campaign committee. And he raised money during the 2025 legislative session into his leadership committee when Mr. Carr was prohibited from doing so.

This Court should protect Mr. Carr's First Amendment rights and enjoin Mr. Jones and his leadership committee for the 2026 gubernatorial primary election. Once that primary is complete and the field is again level, then the winner of the gubernatorial primary will be free to use a leadership committee in the general election. But the patent violations of the U.S. Constitution cannot continue. This Court should grant the emergency relief sought in this motion.

## FACTUAL ALLEGATIONS

The facts of this situation are largely not in dispute. Mr. Carr is the Attorney General of the State of Georgia and announced he was running for Governor on November 21, 2024. Declaration of Neil Bitting, attached as Ex. A (Bitting Dec.) at ¶ 3. Plaintiff Carr for Georgia, Inc., is Mr. Carr's registered campaign committee. *Id.* at ¶ 4.

W. Burt Jones is the Lt. Governor of Georgia and announced he was running for Governor on July 8, 2025. *Id*. at ¶ 5. WBJ Leadership Committee is Mr. Jones' leadership committee as defined by Georgia law, O.C.G.A. § 21-5-34.2(a), and, to be an authorized leadership committee, must be chaired by Mr. Jones. *Id*. at ¶ 6. And Burt Jones for Georgia, Inc., is Mr. Jones' registered campaign committee. *Id*. at ¶ 7.

Just before Mr. Jones announced he was running for Governor, he loaned his leadership committee a total of $10 million. *Id*. at ¶ 8, Ex. 1. On the same report, Mr. Jones reported that his leadership committee also had more than $4 million in contributions from other sources, including funds raised during the 2025 legislative session. *Id*. at ¶¶ 9–11, Ex. 1. The total cash on hand reported for Mr. Jones' leadership committee was over $14 million. *Id*. at ¶ 12.

Following Mr. Jones' announcement of his campaign for Governor, he represented publicly that he had more than $14 million available to support his candidacy. *Id*. at ¶¶ 13, 20, Ex. 2. His campaign committee also began spending money the same day he announced for Governor. Id. at ¶ 14, Ex. 3. He also continued raising money for his leadership committee, sending out email solicitations and holding events specifically for his leadership committee in support of his gubernatorial campaign. *Id*. at ¶¶ 15–19. At an event at the Marietta Country Club for his leadership committee, the Club displayed the following

3

sign—clearly indicating that the event was to support his gubernatorial campaign by raising money for his leadership committee:



*Id.* at ¶ 18.

Mr. Jones' actions have had a direct effect on Mr. Carr's fundraising, with donors raising questions about his campaign as a result of Mr. Jones' use of his leadership committee. *Id.* at ¶ 21. Mr. Carr is not currently able to coordinate with

any outside entity in support of his campaign for Governor without running afoul of contribution limits. *Id*. at ¶ 22. As a result, Mr. Jones has a significant advantage in his ability to communicate the messages he wishes to communicate to Georgia voters, due solely to his office. *Id*. at ¶ 23. Although both Mr. Jones and Mr. Carr are statewide elected officials, Mr. Carr is not permitted to establish a leadership committee. *Id*. at ¶ 24.

The 2026 Republican gubernatorial primary is well underway, with only approximately nine more months in the campaign. *Id*. at ¶ 25. While Mr. Carr will be prohibited by Georgia law from raising funds during approximately three months of that period due to the legislative session, Mr. Jones will face no such limitation with his leadership committee fundraising. *Id*. at ¶ 26.

## ARGUMENT AND CITATION OF AUTHORITY

This Court may grant preliminary relief when a party establishes: (1) "it has a substantial likelihood of success on the merits"; (2) "irreparable injury will be suffered unless the injunction issues"; (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party"; and (4) "if issued, the injunction would not be adverse to the public interest." *Jones v. Gov. of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (quotation omitted); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because all four factors favor Mr. Carr and Carr for Georgia, Inc., they are entitled to preliminary relief.

5

## I. Plaintiffs have an extremely high likelihood of succeeding on the merits of their claims.

The First Amendment, incorporated through the Fourteenth Amendment, prohibits the State and state actors from "abridging the freedom of speech." U.S. Const. amend. I. And "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010).

Due to the First-Amendment implications of campaign-finance regulations, laws limiting speech cannot be upheld unless they satisfy at least "exacting scrutiny." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). That is, a regulation limiting campaign contributions or expenditures must be "justified by a compelling state interest," *Davis v. FEC*, 554 U.S. 724, 740 (2008) (citations omitted), and be "narrowly tailored" to that interest, *Randall v. Sorrell*, 548 U.S. 230, 261 (2006); *see also FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 261 (1986).

Plaintiffs are also entitled to equal protection under the law, especially where, as here, uneven and discriminatory treatment burdens his First Amendment rights in a political campaign. To justify such unequal treatment, a law must satisfy "greater scrutiny." *See Riddle v. Hickenlooper*, 742 F.3d 922, 927 (10th Cir. 2014).

6

### A. Plaintiffs have standing.

In order to have standing to invoke this Court's jurisdiction, Plaintiffs must show they have (1) an injury in fact that (2) is fairly traceable to the challenged action and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). All three elements are met based on precedent from this Court regarding leadership committees.

As this Court has explained, "the unequal treatment afforded by the statute was an injury sufficient to confer standing . . . to file a First Amendment challenge." *One Georgia, Inc. v. Carr*, 601 F. Supp. 3d 1291, 1302 (N.D. Ga. 2022); *accord Perdue v. Kemp*, 584 F. Supp. 3d 1310, 1319 (N.D. Ga. 2022). That same injury is present for Mr. Carr and his campaign committee, which face different contribution limits than Mr. Jones and his leadership committee.

Further, the injury is traceable "to the unequal campaign finance scheme" and an order requiring Mr. Jones to abide by the same limits as every other gubernatorial candidate would redress the injury because it would "place both [Mr. Jones] and his challengers under the same contribution limitation for the primary election." *Perdue*, 584 F. Supp. 3d at 1320.

As a result, Plaintiffs have demonstrated the three prerequisites and have standing to bring this action.

**B.     Leadership committees create different contribution limits for candidates when used in elections against candidates without access to them.**

As this Court previously explained, "[s]pending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association." *Perdue*, 584 F. Supp. 3d at 1322 (quoting *Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001) and citing *Ala. Democratic Conf. v. Broussard*, 541 F. App'x 931, 932–33 (11th Cir. 2013)). While this speech may be regulated "to protect against corruption or the appearance of corruption," regulations cannot be used "to restrict the political participation of some in order to enhance the relative influence of others." *Perdue*, 584 F. Supp. 3d at 1322 (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014)).

As a result, "the Supreme Court has 'never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other,' and has opined that 'the unprecedented step of imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment.'" *Perdue*, 584 F. Supp. 3d at 1323 (quoting *Davis*, 554 U.S. at 738, 743-44). This is exactly the situation faced by Plaintiffs—Mr. Jones has different contribution limits than Plaintiffs and can utilize his leadership committee to loan himself money, raise

8

unlimited funds to pay off that loan, then move the funds immediately to his campaign committee. He also can raise unlimited funds into his leadership committee then spend those funds fully coordinated with his candidate campaign committee. Plaintiffs have no such options.

This Court has previously ruled that the leadership committee structure "effectively negates the contribution limit upon which all candidates for Governor in the primary election are bound for just one person." *Perdue*, 584 F. Supp. 3d at 1323; *see also One Georgia, Inc.*, 601 F. Supp. 3d at 1309. Because that is occurring here, despite this Court's clear rulings in 2022, the First Amendment is violated. And the only remaining question is to determine whether there is any sufficiently important state interest that can justify the conduct.

### C. No valid government interest supports the violation of the First Amendment here.

As this Court explained, there is only one "legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *Perdue*, 584 F. Supp. 3d at 1323–24 (quoting *McCutcheon*, 572 U.S. at 206). No facts support that interest here.

First, there can be no anticorruption interest when Mr. Jones' leadership committee enabled him to raise massive amounts of money into that committee during the 2025 legislative session, including from registered lobbyists with business before the Senate. Bitting Dec. at ¶¶ 9–12, Ex. 1. During the same session,

9

Plaintiffs were prevented from Georgia law from raising any funds into the Attorney General's gubernatorial campaign committee, despite his lack of involvement in the legislative process. O.C.G.A. § 21-5-35.

Second, the fact that the contributions were made transparently (at least after the session was over), does not indicate that any interest in transparency is supported here. As this Court explained, "requiring the disclosure of such contributions to the sitting [Lt.] Governor who uses a leadership committee to accept such contributions, does little to reduce the potential corruption that is the focus of the ban on receiving contributions during the legislative session." *Perdue*, 584 F. Supp. 3d at 1325.

Third, "there is no indication from the plain language of O.C.G.A. § 21-5-34.2, when considered with the previously enacted prohibition on contributions during the legislative session, that the state's interest in enacting O.C.G.A. § 21-5-34.2 is the prevention of corruption or the appearance of corruption." *Id*.

As a result, there is no valid state interest that can support the burden on free speech imposed on Plaintiffs by Mr. Jones' use of his leadership committee in the primary election.

Even if there was some anticorruption interest, Mr. Jones' use of his leadership committee under the statute is not narrowly tailored to that interest. It leaves in place the contribution limits for some candidates but removes them for

certain officeholders. That makes no sense for an anticorruption statute, however, because actual or apparent corruption relating to campaign contributions is inherently tied to the potential for misuse of public office—and Mr. Jones is far more connected to the legislative process than Mr. Carr. *Buckley*, 424 U.S. at 30. Thus, any anticorruption interest would be far stronger with the presiding officer of the Senate than with the Attorney General. As a result, there can be no narrow tailoring because "the statute is not closely drawn to serve" even a potential anti-corruption interest. *Perdue*, 584 F. Supp. 3d at 1327.

Plaintiffs have established a significant likelihood of success on the merits given the critical First Amendment issues here and the complete lack of any state interest justifying Mr. Jones' use of his leadership committee in the primary election.

### D.     Plaintiffs are also likely to succeed on their Equal Protection claim.

While the First Amendment claims are strong enough standing alone to justify granting relief, Plaintiffs are also likely to succeed on their Equal Protection claims. The Fourteenth Amendment prohibits state actors from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Where, as here, the challenged classification is not itself "suspect" but does infringe upon a fundamental right, "greater scrutiny" is required. *Riddle*, 742 F.3d at 927; *accord Buckley*, 424 U.S. at 30–35.

11

There can be no dispute that Mr. Jones' use of his leadership committee discriminates against Mr. Carr, especially in the primary election. Mr. Jones can raise and spend unlimited contributions during the primary while Mr. Carr cannot. That disparity is already affecting the primary election. Donors to Mr. Carr's campaign have raised questions about his ability to challenge a candidate with no fundraising limits. Bitting Dec. at ¶ 21. Mr. Carr is unable to loan funds to a committee from which he can raise an unlimited amount of donor contributions. As explained previously, none of these burdens on Plaintiffs are narrowly tailored to advance the legitimate governmental interest of avoiding corruption and its appearance. And even if they were, that interest is not compelling.

As the Tenth Circuit explained in *Riddle*, a campaign-finance regulation that imposed different (and unequal) contribution limits for write-in candidates and political party nominees was unconstitutional, because the "discriminatory limits are not closely drawn to the State's interest in battling corruption or the appearance of corruption." *Riddle*, 742 F.3d at 929. This same "basic favoritism between candidates vying for the same office" is inherent in the use of Mr. Jones' leadership committee in the primary.

As a result, Plaintiffs are also likely to prevail on their claim that Mr. Jones' use of his leadership committee prior to becoming the nominee for Governor for

any political party violates the Equal Protection Clause of the Fourteenth Amendment as well as the First Amendment.

### E. Mr. Jones and WBJ Leadership Committee are state actors for purposes of 42 U.S.C. § 1983.

Mr. Jones and his leadership committee are also acting under color of state law sufficient to be sued under 42 U.S.C. § 1983. A private party can be considered a state actor in one of three circumstances:

> (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private part[y] performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) the State had so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise ("nexus/joint action test").

*Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (citation and alterations omitted). As this Court explained, "[t]he determination of whether private actions can fairly be attributed to the state under *any* of these three tests is a fact specific determination to be made on a case-by-case basis." *One Georgia*, 601 F. Supp. 3d at 1308 (emphasis added).

WBJ Leadership Committee is not a state entity, but the State at least significantly encouraged the creation of leadership committees by providing the statutory option for certain officials to bypass contribution limits. Further, WBJ Leadership Committee's "ability to perform its function is entirely dependent upon and intertwined with" Mr. Jones. *Id.* For the leadership committee to be

13

valid, it must be chaired by Mr. Jones. O.C.G.A. § 21-5-34.2. If Mr. Jones no longer holds the office of Lt. Governor, he must transfer the assets of that committee to someone else who is eligible to chair such a committee. *Id*.

Just as this Court held previously, Mr. Jones "has 'so far insinuated [him]self into a position of interdependence with the [WBJ Leadership Committee] that [he] is a joint participant in the enterprise." *Id*. (quoting *Rayburn*, 241 F.3d at 1348). As a result, WBJ Leadership Committee and Mr. Jones qualify as state actors for purposes of 42 U.S.C. § 1983.

## II. Plaintiffs will suffer irreparable injury without this Court's intervention.

This is a First Amendment case first and foremost, meaning Plaintiffs have a *per se* irreparable injury. As this Court previously explained, "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Perdue*, 584 F. Supp. 3d at 1327 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) and citing *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983)).

Further, First Amendment violations, "because of [their] intangible nature, could not be compensated for by monetary damages." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010). And Plaintiffs are suffering ongoing injury in the chilling effect on donors in addition to the burden on their First Amendment

rights. A preliminary injunction that stops these ongoing harms is ultimately necessary for a fair gubernatorial primary.

### III. The balance of harms weighs heavily in favor of Plaintiffs.

The balance of harms demonstrates that Plaintiffs will suffer far greater harms than Mr. Jones and his leadership committee if this Court enters the requested relief. The only effect on Mr. Jones will be to require him to play on the same, level playing field as all other candidates for Governor in 2026. But the harm to Plaintiffs without relief from the Court is significant—having an opponent with completely unlimited fundraising and the ability to flow money through his leadership committee to his campaign account without contribution limits. This state of affairs is "antithetical to the First Amendment." *Perdue*, 584 F. Supp. 3d at 1328 (quoting *Davis*, 554 U.S. at 743-44); *see also One Georgia*, 601 F. Supp. 3d at 1309.

Further, Plaintiffs have acted quickly. Mr. Jones announced his candidacy for Governor less than a month ago and announced the existence of the $10 million loan in the same timeframe. Plaintiffs moved expeditiously to protect their rights.

### IV. The public interest favors an injunction.

Finally, the public interest weighs heavily in favor of granting an injunction. ""[T]he public interest is always served in promoting First Amendment values." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001). And as

this Court explained, "[t]he public has no legitimate interest in the enforcement of an unconstitutional statute." *Perdue*, 584 F. Supp. 3d at 1328 (quoting *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010)).

The public would also be served by ensuring that all candidates in the election for Governor in 2026 are playing on an even playing field. There is no challenge in this lawsuit to the contribution limits under Georgia law, nor a challenge to the entirety of the leadership committee structure. Instead, it is the actions of Mr. Jones and his leadership committee using the leadership committee in the primary that are "antithetical to the First Amendment." *Perdue*, 584 F. Supp. 3d at 1328 (quoting *Davis*, 554 U.S. at 743-44).

## V.   Requested scope of relief.

As indicated in the attached Proposed Order, the relief here needs to be targeted to the situation created by Mr. Jones' actions in light of this Court's prior rulings. And the loan reportedly made by Mr. Jones to his leadership committee complicates the situation from the 2022 cases, because Mr. Jones is able to raise unlimited funds in the leadership committee to then repay that loan back to himself. He then would then be able to turn around and move those same funds

to his candidate campaign committee—an arrangement that would allow this flow-through to wash away contribution limits entirely.[1]

As a result, this Court should enter relief that protects the political process and ensures the funds currently in Mr. Jones' leadership committee cannot be funneled into other entities, whether his candidate committee or various nonprofit organizations like 501(c)(4) issue-advocacy entities. In order to fully protect the public and the primary electorate, that includes appointing a magistrate judge to oversee the spending and ensure that only authorized funds are used.

## CONCLUSION

The First Amendment and a level playing field matter. Despite being aware of this Court's prior rulings on leadership committees, Mr. Jones has proceeded in ways that violate the U.S. Constitution. This Court must put that to a stop and grant this motion.

---

[1] A hypothetical of how this works demonstrates the danger: A candidate loans a leadership committee a sum of $500,000, then requests two contributions of $250,000 each from two wealthy donors because contributions to leadership committees are not limited. Once those are paid, the candidate can repay the personal loan made to the leadership committee, and then loan his candidate committee the $500,000 he raised, funneling the unlimited contributions from the leadership committee into the candidate campaign committee through the loan arrangement.

Respectfully submitted this 7th day of August, 2025.

>/s/ Bryan P. Tyson
> Bryan P. Tyson
> Georgia Bar No. 515411
> btyson@clarkhill.com
> **Clark Hill PLC**
> 3630 Peachtree Road NE
> Suite 550
> Atlanta, Georgia 30326
> 678.370.4377 (phone)
>
> *Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned certifies that the foregoing Brief has been prepared in Book Antiqua 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
