# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| CHRIS CARR and CARR FOR GEORGIA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> WBJ LEADERSHIP COMMITTEE, INC.; W. BURT JONES in his personal and official capacity as Lt. Governor of the State of Georgia; BURT JONES FOR GEORGIA, INC., <br><br> Defendants. | Civil Action No. <br> 1:25-cv-04426-VMC |

## ORDER

This case comes before the Court on Plaintiffs Chris Carr and Carr for Georgia, Inc.'s (collectively, "Plaintiffs") Emergency Motion for Preliminary Injunction. (Doc. 2-1). Plaintiffs seek an Order enjoining defendants WBJ Leadership Committee, Inc. ("WBJ"), W. Burt Jones, in his personal and official capacity as Lieutenant Governor of the State of Georgia, and Burt Jones for Georgia, Inc. from "raising and spending unlimited funds for the 2026 Republican primary election" against Mr. Jones.[1] (*Id.* at 2).

---

[1] Plaintiffs' Motion requests that this Court: (1) enjoin "any leadership chaired by Mr. Jones, including WBJ Leadership Committee, Inc." from "accepting contributions or making expenditures" until after the conclusion of the 2026 gubernatorial primary; (2) enjoin Mr. Jones and WBJ "from making expenditures

After careful consideration of the parties' submissions and the arguments made at a hearing, the Court finds that Plaintiffs lack standing and therefore denies Plaintiffs' Emergency Motion for Preliminary Injunction (Doc. 2) and dismisses the case.

## I.   Background

This case concerns a dispute between candidates for the 2026 gubernatorial Republican primary. Plaintiff Chris Carr is the current Attorney General of the State of Georgia. (Doc. 1 ¶ 9). He announced his candidacy for Governor on November 21, 2024. (*Id.*). Plaintiff Carr for Georgia, Inc. is Mr. Carr's campaign

---

of leadership committee funds for the purpose of affecting the outcome of the election between Mr. Jones and Mr. Carr," including by "enjoining Mr. Jones and WBJ Leadership Committee from making expenditures of leadership committee funds for advertisements or other communications that depict or reference Mr. Jones or Mr. Carr;" (3) require Mr. Jones and WBJ to "immediately reverse all transactions paid for by WBJ Leadership Committee, Inc. that support the election of Mr. Jones to the office of Governor from July 8, 2025 to the present" and, to the extent transactions by WBJ cannot be reversed or refunded, order Mr. Jones to transfer from his principal campaign committee, Burt Jones for Georgia, Inc., to WBJ an amount equal to the funds already expended by WBJ; (4) enjoin Mr. Jones from repaying personal loans made to WBJ until after the 2026 gubernatorial primary is complete; (5) enjoin Mr. Jones and WBJ from transferring any funds from WBJ to other political or nonprofit organizations, including but not limited to 501(c)(4) organizations; (6) prohibit Mr. Jones from making any loans from his personal assets to Burt Jones for Georgia, Inc. until after the primary election in 2026 is complete; (7) appoint a Magistrate Judge to oversee all spending by Mr. Jones, Burt Jones for Georgia, Inc., and WBJ, and require all Defendants to report to the Court the specific transactions made by WBJ and Burt Jones for Georgia, Inc. from July 8, 2025 to the present, including documentation of the source of all loans made by Mr. Jones to WBJ. (*Id.* at 3).

2

committee for Governor, as defined by Georgia law, O.C.G.A. § 21-5-3(2). (*Id.* ¶ 10). Defendant W. Burt Jones is the current Lieutenant Governor of the State of Georgia. (*Id.* ¶ 12). On July 8, 2025, Mr. Jones announced his candidacy for Governor. (*Id.*). Defendant WBJ is a leadership committee, as defined by O.C.G.A. § 21-5-34.2(a) (the "LC Statute"), that is registered with the Georgia Government Transparency and Campaign Finance Commission (the "Commission") and is chaired by Mr. Jones in his official capacity as the Lieutenant Governor. (*Id.* ¶ 11).

To understand the core of the dispute, the Court will provide a brief overview of the relevant campaign contribution scheme. The LC Statute provides, in pertinent part, that "[a] leadership committee may accept contributions or make expenditures for the purpose of affecting the outcome of any election of advocating for the election or defeat of any candidate . . . ." O.C.G.A. § 21-5-34.2(d); *Perdue v. Kemp*, 584 F. Supp. 3d 1310, 1313 (N.D. Ga. 2022). A "leadership committee" is defined as follows:

> a committee, corporation, or organization chaired by the Governor, the Lieutenant Governor, the nominee of a political party for Governor selected in a primary election in the year in which he or she is nominated, or the nominee of a political party for Lieutenant Governor selected in a primary election in the year in which he or she is nominated. Such term shall also mean up to two political action committees designated by the majority caucus of the House of Representatives, the minority caucus of the House of Representatives, the majority caucus of the Senate, and the minority caucus of the

> Senate. No person may chair more than one leadership committee.

O.C.G.A. § 21-5-34.2(a).[2] A leadership committee is required to disclose contributions or expenditures in excess of $500.00 and may accept contributions without monetary limitation. O.C.G.A. § 21-5-34.2(d)-(e). Additionally, leadership committees are considered "a separate legal entity from a candidate's campaign committee[3] and shall not be considered an independent committee."[4] O.C.G.A. § 21-5-34.2(f).

---

[2] A "political party" is defined as any political organization which, at the preceding gubernatorial election, nominated a candidate for Governor who "polled at least 20 percent of the total vote cast in the state for Governor," or which at the preceding presidential election nominated a candidate for President who "polled at least 20 percent of the total vote cast in the nation for that office." *See* O.C.G.A. § 21-2-2(25).

[3] A "campaign committee" is defined as "the candidate, person, or committee which accepts contributions or makes expenditures designed to bring about the nomination or election of an individual to any elected office. The term 'campaign committee' also means any person or committee which accepts contributions or makes expenditures designed to bring about the recall of a public officer holding elective office or to oppose the recall of a public officer holding elective office or any person or any committee which accepts contributions or makes expenditures designed to bring about the approval or rejection by the voters of any proposed constitutional amendment, a state-wide referendum, or a proposed question which is to appear on the ballot in this state or in a county or a municipal election in this state." O.C.G.A. § 21-5-3(2).

[4] An "independent committee" is "any committee . . . other than a campaign committee, political party, or political action committee, which receives donations during a calendar year from persons who are members or supporters of the committee and which expends such funds either for the purpose of affecting the outcome of an election for any elected office or to advocate the election or defeat

Leadership committees differ in a number of ways from campaign committees and independent committees. For one, as noted earlier, a leadership committee can be chaired only by the individuals occupying the roles identified in the LC Statute. *See* O.C.G.A. § 21-5-34.2(a). And based on the LC Statute, those individuals are not subject to the contribution limits that apply to other candidates for statewide office if they choose to collect money through a leadership committee. *Perdue*, 584 F. Supp. 3d at 1315. Further, while candidates for statewide office and their campaign committees may not seek or accept campaign contributions during a legislative session, O.C.G.A. § 21-5-35(a), no such restriction is imposed upon a leadership committee chaired by a sitting Governor or Lieutenant Governor. *Id.*

Like leadership committees, independent committees can raise and expend funds to influence the election of a candidate for statewide office without any limitation on the amount of contributions or expenditures. *Id.* However, independent committees may not coordinate their activities with an individual candidate or his or her campaign committee. *Id.* (citing O.C.G.A. § 21-5-3(15)); *see* Ga. Comp. R. & Regs, r. 189-6-.04 ("Campaign contribution limits on contributions to candidates do not apply to independent expenditures made to influence candidate elections. An independent expenditure is an expenditure for a

---

of any particular candidate." O.C.G.A. § 21-5-3(15).

communication which expressly advocates the election or defeat of a clearly identified candidate but which is made independently of any candidate's campaign."). As a result of this statutory scheme, a sitting Lieutenant Governor may seek and accept contributions for a primary election in an unlimited amount both during and after the legislative session, whereas other candidates for Governor, like Mr. Carr, must adhere to the contribution limits set by O.C.G.A. § 21-5-41(a).[5] Therefore, as a result of the LC Statute, it is undisputed that while Mr. Carr is limited in the amount of money he can raise, Mr. Jones, as the current Lieutenant Governor and chair of the WBJ, may raise and spend unlimited amounts of money through WBJ. (Doc. 1 ¶ 8).

This is the fifth case in four years challenging some aspect of the LC Statute. *See Perdue* 584 F. Supp. 3d 1310 (granting a preliminary injunction after finding that the LC Statute violated Plaintiff's rights under the First Amendment); *One Ga., Inc. v. Carr*, 601 F. Supp. 3d 1291 (N.D. Ga. 2022) (same), *appeal dismissed as moot sub nom. One Ga., Inc. v. Georgians First Leadership Comm., Inc.*, No. 22-11495-J, 2022

---

[5] The statute provides that the maximum allowable contribution was $5,000 for a primary election and $3,000 for a primary runoff election. O.C.G.A. § 21-5-41(a). However, these amounts can be raised or lowered at the end of each gubernatorial election cycle, based on inflation or deflation. O.C.G.A. § 21-5-41(k). The current contribution limits for statewide elected office are $8,400 for a primary election and $4,800 for a primary runoff. *See* Ga. Gov't Transparency and Campaign Fin. Comm'n, www.ethics.ga.gov/contribution-limits (last visited August 22, 2025); *see also Perdue*, 584 F. Supp. 3d at 1314 n.2.

WL 16631279 (11th Cir. Aug. 2, 2022); *Graham v. Carr*, 634 F. Supp. 3d 1343 (N.D. Ga. 2022) (denying preliminary injunction because plaintiffs failed to establish that they had standing); *Democratic Party of Ga. v. Kemp*, 1:24-cv-3154-MHC (N.D. Ga. Sept. 19, 2024) (same).

The previous cases differ from the instant suit in significant ways. First, in all four cases, the defendants were a combination of state officials serving in their official capacity and members of the Commission—officers tasked with enforcing the campaign finance structure—as well as candidates and their allegedly offending leadership committees. *See* O.C.G.A. § 21-5-6. Additionally, in each case, the plaintiffs challenged the constitutionality of the LC Statute on the ground that it violated their constitutional rights.

Here, Plaintiffs sue only Mr. Jones in his personal and official capacity, WBJ Leadership Committee Inc., and Burt Jones for Georgia, Inc. (Doc. 1). Additionally, Plaintiffs contend that they do not challenge the contribution limits under Georgia law, nor do they challenge the leadership committee structure. (Doc. 2-1 at 16 ("There is no challenge in this lawsuit to the contribution limits under Georgia law, nor a challenge to the entirety of the leadership committee structure.")). Instead, Plaintiffs challenge "the actions of Mr. Jones and his leadership committee using the leadership committee in the primary" which Plaintiffs argue is "antithetical to the First Amendment." (*Id.*). As such, the allegations in the

7

Complaint center on the actions taken by Defendants relating to the contributions to, and expenditures from, WBJ in preparation for the 2026 Republican gubernatorial primary. (Doc. 1 ¶ 48).

For example, Plaintiffs present evidence that tens of thousands of dollars were raised by lobbyists and entities with lobbyists for WBJ. (*Id.* ¶ 48 (alleging that three registered lobbyists gave a total of $30,000 to WBJ, one company gave $100,000 to WBJ, another company gave $25,000 to WBJ, the CEO of a hospital network gave $100,000 to WBJ)). These donations were all received during the 2025 legislative session, whereas Mr. Carr and his campaign for Governor were prohibited from fundraising. (*Id.* ¶ 49). Further, Mr. Jones has reported to the Commission that he has more than $14 million available to spend in his leadership committee, including funds raised in tranches of $50,000 and $100,000 from single donors and a $10 million personal loan.[6] (*Id.* ¶ 58). And, as the Court explained above, these funds can be spent in coordination with Mr. Jones. (*Id.* ¶ 60). Additionally, since the Republican primary for Governor of Georgia will not take place until May 19, 2026, Mr. Carr is limited to soliciting donations through his

---

[6] Plaintiffs express incredulity that Mr. Jones could acquire a $10 million loan, when just five years ago, Mr. Jones stated in a financial disclosure that he had a total net worth of $12 million, where "only $700,000" was in cash equivalents. (Doc. 1 ¶ 63). Therefore, Plaintiffs speculate that Mr. Jones may not have accurately reported the source of the loan. (*Id.* ¶ 65). If that is the case, Plaintiffs contend, then the damage to Mr. Carr and his campaign committee is compounded. (*Id.*).

campaign committee which is subject to contribution caps, while Mr. Jones can continue to raise unlimited funds through WBJ, meaning that Mr. Carr's ability to raise funds is likely to lag behind Mr. Jones' fundraising. (*Id.* ¶ 54). Thus, due to Mr. Jones' coordinated spending with his leadership committee, Plaintiffs allege that they will suffer ongoing and irreparable harm because they are still bound by the contribution limits of Georgia law. (*Id.* ¶ 71).

Plaintiffs bring two counts against Defendants: Violation of Rights to Freedom of Speech under the First and Fourteenth Amendments through 42 U.S.C. § 1983 (Count I), and Violation of Equal Protection Clause through 42 U.S.C. § 1983 (Count II). In support of their request for injunction, Plaintiffs request that the Court "enter relief that protects the political process and ensures the funds currently in Mr. Jones' leadership committee cannot be funneled into other entities, whether his candidate committee or various nonprofit organizations like 501(c)(4) issue-advocacy entities." (Doc. 2-1 at 17).

**II.    Discussion**

Defendants argue that Plaintiffs lack standing to bring their motion for injunctive relief against them. (*See* Doc. 13 at 8; Doc. 14 at 9). Specifically, Defendants contend that Plaintiffs have failed to demonstrate that they have suffered cognizable injuries that are fairly traceable to Defendants and that would likely be redressed by this Court. (Doc. 13 at 8; Doc. 14 at 10).

Article III of the United States Constitution expressly limits federal jurisdiction to "cases and controversies" and does not permit federal courts to issue advisory opinions. *Miller v. F.C.C.*, 66 F.3d 1140, 1145 (11th Cir. 1995) (citing *Flast v. Cohen*, 392 U.S. 83, 94–96 (1968)). "To have a case or controversy, a litigant must establish that he [or she] has standing." *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). For a litigant to establish standing, he or she must first have suffered an "injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Ga. State Conf. of NAACP Branches v. Cox*, 183 F.3d 1259, 1262 (11th Cir. 1999) (citations omitted); *see Graham*, 634 F. Supp. 3d at 1350. Second, there must be a causal connection between the injury and the challenged action of the defendant which is not too attenuated. *Lujan*, 504 U.S. at 560. Third, it must be likely rather than speculative that "the injury will be redressed by a favorable decision." *Id*. at 561 (citations and internal quotations omitted). The three components form an "irreducible constitutional minimum." *Id.* at 560. "The party invoking federal jurisdiction bears the burden of establishing these elements which, at the initial pleading stage, may be established based on general factual allegations of the injury." *Graham*, 634 F. Supp. 3d at 1351 (citing *Lujan*, 504 U.S. at 561).

## A.   Injury in Fact

To satisfy the injury-in-fact requirement, Plaintiffs must show that their alleged injury is "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical." *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1337 (N.D. Ga. 2023) (citing *Lujan*, 504 U.S. at 560). "A concrete injury must be *de facto*; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) ("When we have used the adjective concrete, we have meant to convey the usual meaning of the term—real and not abstract."). An injury is sufficiently concrete for standing purposes, if it constitutes an "invasion of a legally protected interest." *See Curling v. Raffensperger*, 776 F. Supp. 3d 1191, 1207 (N.D. Ga. 2025) (quoting *Spokeo*, 578 U.S. at 330).

Plaintiffs argue that they are suffering a direct injury because they are subject to campaign-contribution limits that do not apply to Mr. Jones and his leadership committee. (Doc. 1 ¶ 24). This campaign contribution scheme, Plaintiffs argue, enables Defendants to infringe upon their First Amendment, Fourteenth Amendment, and Equal Protection Rights. (*See id.*). Specifically, Plaintiffs allege that as a result of the LC Statute, Mr. Jones' leadership committee can raise unlimited funds, fully coordinate the activities of that committee with his principal campaign committee, and raise funds during the legislative session. (*Id.* ¶ 25). In contrast, Plaintiffs, and in particular Carr for Georgia, Inc., are bound by the contribution limits set forth in O.C.G.A. 21-5-41(a), thereby making it illegal for them to solicit or receive contributions in excess of those limits. (*Id.* ¶ 71). As a result, Mr. Jones is able to expend substantially more funds than Mr. Carr during

11

the gubernatorial primary race. (*Id.* ¶ 28). This means that Plaintiffs must solicit a significant amount of additional individual contributions in less time in order to be competitive with Defendants' primary campaign.

In response, Defendants assert that Plaintiffs have impermissibly conflated the alleged injuries of Mr. Carr and the Carr Campaign. (*See* Docs. 13 at 8; Doc. 14 at 9). Mr. Carr, Defendants contend, faces no restriction on contributions or loans that he may personally make to his campaign. (Doc. 13 at 8). Further, the Carr Campaign is not limited in the size of any loan it may secure. *See* O.C.G.A. § 21-5-41(i). In addition, Defendants point out that Georgia law imposes no cap on the amount the Carr Campaign or the Carr independent committee may spend to promote Mr. Carr's candidacy. (Doc. 14 at 11). Further, Defendants reject the notion that Plaintiffs' First Amendment rights are injured because they cannot receive unlimited contributions because: (1) Plaintiffs cite to no binding precedent establishing that the Carr Campaign has a "right to receive campaign contributions," and (2) the Supreme Court has frequently upheld different contribution limitations imposed on different types of committees. (Doc. 13 at 10 (citing *McConnell v. FEC*, 540 U.S. 93, 157 (2003), *overruled in part by Citizens United v. FEC*, 558 U.S. 310 (2010))). Defendants also argue that Plaintiffs' purported injury, which Plaintiffs define as a perceived lack of "level playing field" between candidates, is neither a constitutional injury, nor a governmental interest. (*Id.* at

12

11). Plaintiffs fare no better on their Equal Protection claim, according to Defendants, because Mr. Carr is treated no differently under Georgia law than Mr. Jones, and his campaign is treated no differently than the Jones Campaign. (*Id.*).

Another judge in this District has twice found that "the unequal treatment afforded by the [LC] statute [is] an injury sufficient to confer standing . . . to file a First Amendment challenge." (Doc. 2-1 at 7 (quoting *One Ga., Inc. v. Carr*, 601 F. Supp. 3d 1291, 1302 (N.D. Ga. 2022)). In *Perdue*, Judge Cohen held that plaintiff David Perdue, a former United States Senator and candidate for the 2022 gubernatorial race, had sufficiently alleged injury in fact where he showed that "the unequal contribution limits created by [the LC Statute] within the same primary election harm[ed] Perdue's ability to promote his candidacy and benefit his campaign committee." 584 F. Supp. 3d at 1319. Similarly, in *One Georgia, Inc.*, Judge Cohen found that because One Georgia was "unable to receive unlimited contributions in the same manner as Governor Kemp, through Georgians First, even though they are both running for the same office," Plaintiffs had successfully alleged an injury in fact. 599 F. Supp. 3d at 1328.

The Court sees no reason to depart from those previous holdings. Defendants attempt to characterize Plaintiffs' asserted injury as an inability to receive unlimited contributions, arguing that Plaintiffs can point to no authority showing there is some right of campaign committees to receive contributions.

13

(Doc. 13 at 10, 11). This ignores the reality that Mr. Carr is also prohibited from *soliciting* contributions in excess of the limits proscribed by Georgia law. *See* O.C.G.A. § 21-5-41(a). Thus, Plaintiffs' Complaint, and the accompanying affidavit, successfully demonstrate that Plaintiffs' First Amendment rights have been hindered, at least indirectly, as participants in the same primary election as Mr. Jones due to their inability to solicit or receive unlimited contributions in the same manner that Mr. Jones can through WBJ.

## B. Traceability

"To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560). "For purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to the allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." *Collins v. Yellen*, 594 U.S. 220, 222 (2021).

Plaintiffs' Complaint states, rather conclusively, that their harms are "traceable to the ability of Defendants to raise and spend unlimited funds under Georgia law." (Doc. 1 ¶ 32). Similarly, in their Emergency Motion for Preliminary Injunction, Plaintiffs assert only that the injury is traceable "to the unequal campaign finance scheme." (Doc. 2-1 at 7).

Defendants argue that Plaintiffs cannot show that "defendant[s] caused" their injuries. (Doc. 14 at 12 (quoting *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Instead, Defendants contend that Plaintiffs' true injuries are caused by the contribution limits imposed by O.C.G.A. § 21-5-41 and the Commission and Attorney General's enforcement of the same. (Doc. 13 at 10–11; Doc. 2-1 at 16 ("There is no challenge in this lawsuit to the contribution limits under Georgia law, nor a challenge to the entirety of the leadership committee structure.")). Plaintiffs do not allege that Mr. Jones is unlawfully operating his campaign committee or that he plays any role in enforcing the campaign contribution scheme. Instead, Plaintiffs appear to allege that Defendants are doing exactly what Georgia law allows them to do. While this has injured Plaintiffs, the Court agrees that the Defendants are not the cause of that injury.

Admittedly, the posture of this case is unique. Mr. Carr, the current Attorney General of the State of Georgia, brings this lawsuit in his personal capacity to challenge, not the constitutionality of the campaign contribution scheme itself, the LC Statute, or the enforcement of either, but his primary opponents' reliance on the law to benefit his campaign to the detriment of Mr. Carr. In short, Plaintiffs ask the Court to twist itself into a logical pretzel to find that by benefiting from a law enacted to confer such a benefit, Defendants caused Plaintiffs' injury. This is complicated even further by the fact that Plaintiffs do not

15

request that the Court invalidate the law. Instead, throughout briefing they ask this Court to assume the law is unconstitutional in order to grant their requested relief. (*See* Doc. 17 at 6 ("[T]hus, it is 'an injury resulting from the application or threatened application of an unlawful enactment [that] remains fairly traceable to such application.'")). Because Plaintiffs have not alleged any injury that is traceable to any action of Defendants, Plaintiffs have failed to establish traceability for the purpose of standing.

## C.     Redressability

To establish redressability, Plaintiffs must prove that there is a substantial likelihood that their injuries would be redressed by a favorable decision on the merits. *See Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 410–14 (2013) (holding that it must be likely, not merely speculative that the injury will be redressed by a favorable decision). Relief that prevents or deters violations from reoccurring satisfies the redressability requirement. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). However, "standing is not dispensed in gross," as "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis*, 554 U.S. at 734 (internal punctuation and citations omitted); *see also Friends of the Earth*, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

Plaintiffs seek various forms of relief from the Court which they assert would "protect the political process." (Doc. 2-1 at 17). The relief sought, Plaintiffs argue, would "target the situation created by Mr. Jones' actions in light of this Court's prior rulings."[7] (*Id.* at 16). In turn, Defendants assert that Plaintiffs' alleged injuries are not redressable by the injunctive relief sought against Defendants for four critical reasons.

First, Defendants argue that Plaintiffs will still suffer their alleged injuries if only Defendants are enjoined. This is because "if only these Defendants are

---

[7] Plaintiffs argue that the Court has set clear ground rules for leadership committees. Specifically, Plaintiffs assert that the Court, via Judge Cohen's prior rulings, has found that a leadership committee infringes on the First Amendment rights of other candidates when one candidate with a leadership committee is able to raise and spend funds with different contribution limits than other candidates in a primary or general election. *See Perdue*, 584 F. Supp. 3d at 1323; *One Ga., Inc.*, 601 F. Supp. 3d at 1309. Plaintiffs are mistaken for two critical reasons. First, those preliminary injunction orders are limited to the parties before the Court. *Perdue*, 584 F. Supp. 3d at 1328–29 (preliminarily enjoining Georgians First Leadership Committee from expending funds during the 2022 republican primary election and 2022 primary runoff election); *One Ga., Inc.*, 601 F. Supp. 3d at 1309 (preliminarily enjoining Georgians First Leadership Committee from soliciting or receiving contributions until and unless Governor Brian Kemp became the Republican Party nominee for Governor of Georgia in the 2022 primary election or primary election runoff). Additionally, neither case resulted in the issuance of a final order on the merits and no appellate court reviewed the analysis in those orders. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give final judgment on the merits."). Therefore, Plaintiffs' assertion that Defendants, and in particular WBJ, acted in violation of the Court's previous orders is incorrect and contrary to well-settled law.

restrained, nothing would stop another leadership committee from providing the same level of support to the Jones Campaign." (Doc. 14 at 13). Because Plaintiffs are not "challenging the entirety of the leadership committee structure," their suit and the remedies requested would not unburden their hindered First Amendment rights, nor would it level the unequal playing field complained of. (*Id.*).

Next, Defendants argue that the absence of the Commission and Attorney General as defendants in this suit deprives Plaintiffs of being able to satisfy redressability because neither Mr. Jones, nor the campaign entities sued, are charged with "enforc[ing] a statute."[8] *See, e.g.*, *Jacobson*, 974 F.3d at 1255 (explaining that a federal court may only enjoin executive officials from taking steps to enforce a statute where the officials who enforce the challenged statute are properly made parties to a suit.").

---

[8] *See* O.C.G.A. § 21-5-6(b)(14)(C)(iii) ("The Attorney General of this state shall, upon complaint by the commission, or may, upon the Attorney General's own initiative if after examination of the complaint and evidence the Attorney General believes a violation has occurred, bring an action in the superior court in the name of the commission for a temporary restraining order or other injunctive relief or for civil penalties for a violation of any provision of this chapter or any rule or regulation duly issued by the commission."); *see also* O.C.G.A. § 21-5-13(d)(2) (defining an action as one in which "a complaint has been accepted by the commission in compliance with Code Section 21-5-7" or "[t]he commission or Attorney General serves on such person a notice of summons or hearing, in accordance with Chapter 13 of Title 50, the 'Georgia Administrative Procedure Act,' that alleges that such person has violated this chapter.").

Third, Defendants argue that the Court does not have the authority to order the overly broad, unconstitutional and draconian relief Plaintiffs request. *See Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1209 (11th Cir. 2021) (explaining that an injunction "must be no broader than necessary to remedy the constitutional violation." (citation omitted)). Lastly, Defendants underscore that Plaintiffs seek no relief from the Lieutenant Governor, demonstrating that no injury is redressable by relief entered against his office. (Doc. 14 at 14).

The Court agrees with Defendants. Plaintiffs' injury would not be redressed by a favorable decision on the merits. Other leadership committees are just as capable of harming Plaintiffs in the same manner that Defendants purportedly do. *See* O.C.G.A. § 21-5-34.2. Further, as the Court previously explained, Plaintiffs' true injury is caused by the campaign contribution scheme and the enforcement of it. Thus, granting Plaintiffs the relief they request would not make it "likely," as opposed to "merely speculative" that the injury would be redressed by a favorable decision. *Booker v. Sec'y Fla. Dep't of Corr.*, 22 F.4th 954, 958 (11th Cir. 2022) (quotations omitted).

For the reasons given above, Plaintiffs have not met their burden of showing standing to bring this case. Though Defendants do not seek dismissal in their Response to Plaintiffs' Motion, (Docs. 13, 14), "it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may

19

be lacking." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999) (citations omitted). "If the Court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Because the Court concludes that Plaintiffs do not have standing, this case is due to be dismissed. *See Jacobson*, 974 F.3d at 1269 (finding error when a district court rules on the merits of a case where the plaintiffs lack standing, because such a ruling would be an advisory opinion).

### III. Conclusion

It is **ORDERED** that Plaintiffs' Emergency Motion for Preliminary Injunction (Doc. 2) is **DENIED** and Defendants' Consent Motion for Extension of Time to File Answer (Doc. 21) is **DENIED AS MOOT**. It is **FURTHER ORDERED** that this case is **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED** this 28th day of August, 2025.

_____
Victoria Marie Calvert
United States District Judge